# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Arletha B. on behalf of L.R.C. (a minor),       Case No. 18-cv-945 (ECW)

        Plaintiff,

    v.                           **ORDER**

Andrew Saul,[1]

        Defendant.

---

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Dkt. No. 17) and Defendant's Motion for Summary Judgment (Dkt. No. 20). Plaintiff Arletha B. filed this case on behalf of her daughter, L.R.C. ("LRC"), seeking judicial review of a final decision by Defendant denying her application for supplemental security income insurance benefits. For the reasons stated below, Plaintiff's Motion is denied, and Defendant's Cross-Motion is granted.

## I.    BACKGROUND

Plaintiff filed a Title XVI application for supplemental security income benefits on May 30, 2014, on behalf of LRC, alleging disability beginning March 20, 2014. (R. 12.)[2] Plaintiff claimed LRC was disabled due to asthma, delayed milestones, attention-

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul, Commissioner of Social Security, is automatically substituted as a party in place of Nancy A. Berryhill, former Acting Commissioner of Social Security.

[2]     The Social Security Administrative Record ("R.") is available at Dkt. No. 16.

deficit/hyperactivity disorder ("ADHD"), receptive/expressive language impairment,

anemia, and hearing problems. (R. 104.) The application was denied initially (R. 101)

and on reconsideration (R. 79). Plaintiff requested a hearing, held on March 29, 2017, at

which LRC appeared but did not testify, before administrative law judge ("ALJ")

Virginia Kuhn. (R. 12.) Plaintiff and Karen H. Butler, Ph.D., an impartial medical

expert, testified at the hearing. (R. 12.) The ALJ issued an unfavorable decision on June

7, 2017, finding that LRC was not disabled. (R. 27-28.)

The ALJ followed the three-step evaluation to determine if an individual under the

age of eighteen is disabled pursuant to 20 C.F.R. § 416.924(a). The three-step evaluation

process proceeds as follows:

> The first step is to inquire whether the claimant is engaged in substantial
> gainful activity. The second step is to ascertain whether the impairment or
> combination of impairments is severe. The third step is to determine whether
> the claimant has an impairment or impairments that meet, medically equal,
> or functionally equal a listed impairment. A claimant will not be considered
> disabled unless he meets the requirements for each of these three steps.

*England v. Astrue*, 490 F.3d 1017, 1020 (8th Cir. 2007) (cleaned up).

At step one, the ALJ determined that LRC had not engaged in substantial gainful

activity. (R. 15.) At step two, the ALJ found that LRC had the following severe

impairments: asthma; ADHD; oppositional defiant disorder ("ODD"); language disorder;

and specific learning disorder in reading, writing, and math. (R. 15.) At step three, the

ALJ concluded that LRC's impairments do not meet, medically equal, or functionally

equal[3] the severity of a listed impairment.  (R. 15-27.)  In reaching that conclusion, the ALJ found that LRC had: (1) a less than marked limitation in acquiring and using information; (2) a less than marked limitation in attending and completing tasks; (3) a less than marked limitation in interacting and relating with others; (4) a less than marked limitation in moving about and manipulating objects; (5) a marked limitation[4] in the ability to care for herself; and (6) no limitation in health and physical well-being.  (R. 19, 20, 22, 23, 24, 26.)

Plaintiff requested a review of the decision.  (R. 1.)  The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1.)  Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

---

[3]     "Functionally equal the listings" means that the "impairment(s) must be of listing-level severity; i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain, as explained in this section."  20 C.F.R. § 416.926a(a).

[4]     A "marked" limitation is an impairment(s) that "interferes seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. 'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  20 C.F.R. § 416.926a(e)(2).

## II.   <u>RECORD</u>

LRC is a female who was born in the second half of 2009, making her four years old when the application was filed on her behalf and seven years old at the time of the hearing before the ALJ.  (R. 12, 161.)

At a January 28, 2014 visit for insect bites—when LRC was four—it was reported that LRC's father was "not really taking any interest in her and so mom is watching her all the time (they are separated)."  (R. 382.)  LRC's mother's current partner was in jail for domestic abuse against the mother.  (R. 382.)  LRC and the mother moved to a new address with no furniture and were getting an order for protection against the partner.  (R. 382.)

On May 5, 2014, Mary E. Johnston, RN, CNP ("NP Johnston") saw LRC for a routine health maintenance visit.  (R. 422.)  NP Johnston noted that LRC had been assessed for ADHD and needed to be redirected a lot and seemed to be very aggressive.  (R. 422.)  NP Johnston wrote a note on LRC's behalf to a child development program called HeadStart, requesting that it provide services to LRC.  (R. 415.)  NP Johnston said that LRC "has social issues due to her hyper behavior and she is in need of interaction with children her age.  Without HeadStart, she will be at a considerable disadvantage in school when she starts kindergarten if she is not socializing with children now.  She unfortunately has to attend an overnight day care due to her mother's work and so she will be sleeping there and will not be playing with other kids."  (R. 415.)

On September 8, 2014, NP Johnston wrote a letter regarding LRC's social security claim on her behalf. (R. 474.) NP Johnston noted that LRC "has a history of physical aggression with peers and adults in the classroom. (R. 474.) She further stated:

> [LRC] pushes people to be hugged constantly, pulls on any tool the provider is using and does not respond to direct requests to stop. She does not appear to have good personal boundaries and does not respond to the social cues that most 4 year olds recognize like disapproval or personal space issues. Because of her lack of ability to comprehend what others want and to express fully what she wants, she is frustrated. This frustration is very likely a large part of her noted aggressive behavior at home and at school; her social interactions are therefore not positive which reinforces her negative behavior.

(R. 474.) NP Johnston concluded that, in her opinion, LRC qualifies for disability. (R. 474.)

On December 4, 2014, when she was five years old, LRC underwent a psychological evaluation by Craig S. Barron, Psy.D., L.P. (R. 477-80.) Dr. Barron, reviewing LRC's records, noted that she had been assessed for ADHD, but instead was given a diagnosis of Behavioral Concerns. (R. 477-78.) Dr. Barron also noted that "[a]t school, [LRC] was seen as hyperactive, distractible, inattentive, disruptive, aggressive and socially inappropriate." (R. 479.) Regarding LRC's activities of daily living, he noted that her sleep is adequate, but she never makes her bed, needs assistance bathing and changing her clothes and is unable to put on her shirt or pants or snap, zip, or button. (R. 479.) Dr. Barron observed that when LRC's mother reads to her, she will sit for approximately 15 minutes, and that "[o]n rare occasions, [LRC] will go to Chucky Cheese and attempts to socialize with other children, but is delayed in that area. She does not play any games." (R. 479.)

On March 19, 2015, when LRC was five, she was observed asking another child if she needed help with her coat, asking if she could help, and helping the child.  (R. 304.)

On September 2, 2015, NP Johnston saw LRC for a routine checkup.  (R. 633-36.) NP Johnston noted that LRC's mother was thinking of taking her to counseling, which NP Johnston encouraged her to do.  (R. 636.)  She also noted that LRC "has had some behavioral problems in the past and although these are not of concern at the moment, she could use the help as these may emerge again."  (R. 636.)

On October 26, 2015, LRC was seen by Nancy Kerian, M.A., L.M.F.T., for an assessment of hyperactivity and aggression.  (R. 613.)  Kerian assessed LRC as friendly in attitude, restless in motor activity, and having intact thought processes.  (R. 615.) Kerian assessed a moderate educational impairment, a mild social or relational impairment, and mild impairments in mood, lack of pleasure, sleep, and labile mood, with moderate impairments in concentration, impulse control, and anger.  (R. 615-16.) Kerian noted LRC "was very friendly with poor boundaries."  (R. 616.)  She also noted that LRC said she had been hurt by people, but her mother brought her to the doctor to check for abuse and found nothing.  (R. 616.)  Kerian noted that LRC's mother stated that she caught LRC taking naked pictures of herself, was recently wetting herself, and was excessively masturbating.  (R. 616.)  At a January 8, 2016 appointment, Kerian noted that LRC had been to her father's house for winter break and returned with what she said were rug burns "from being dragged around the house."  (R. 618.)  LRC reported that her father and his girlfriend have hit her with a belt and that the girlfriend "was the one who took pictures of [LRC's] private part."  (R. 618.)  On March 16, 2016, Kerian—at another

appointment—noted that LRC was currently suspended from her kindergarten school for "spitting, hitting, yelling, refusals to do her work." (R. 620.)

During her kindergarten school year, LRC was assessed between "sometimes" and "consistently" in the "social" categories of "interacts well with others," "respects rights and property of others," and "resolves conflict peacefully." (R. 590.) Her teacher commented that she "enjoys playing with her friends and always greets them with a big smile." (R. 590.) Her teacher also commented that LRC "enjoys Center Time learning activities and talking with her friends [but] needs guidance in being aware of her personal space and accepting responsibility for her actions. (R. 590.) LRC had several behavioral reports during kindergarten in February and March 2016, including: "Telling a student he looked like ass. Disrupting [bus] loading and route. Touching butts, trying to touch a pre-k 'in the nuts'. Throwing her gloves, standing on seat, yelling. Holding hands to her crotch and pretending she had a penis." (R. 831.)

LRC's mother took her to see Christine Brady, Ph.D., L.P. on March 25, 2016, for a behavioral health progress note. (R. 663-64.) Dr. Brady noted that LRC's mother reported "escalating behavioral problems including biting kids, jumping around on the bus, hitting Aunt with Down Syndrome, etc." (R. 664.) She further noted that LRC "has been suspended from school four times this year and [the school] is threatening to expel." (R. 664.) Dr. Brady and LRC's mother discussed referral options. (R. 664.)

Dr. Brady assessed LRC on April 5, 2016 and determined that "[b]ased on the patient's report of symptoms, she likely meets criteria for Oppositional Defiant Disorder [("ODD")] and symptoms of ADHD. However, further assessment is warranted from

teacher perspective, therefore only ODD is being diagnosed today." (R. 673.) Dr. Brady

also concluded that LRC's "mental health concerns have been affecting her ability to

function and have been causing clinically significant distress. The patient is experiencing

Moderate psychosocial stress." (R. 673.) Dr. Brady also noted that LRC, in her

kindergarten year, did not have an Individualized Education Program ("IEP") or receive

special education classes. (R. 671.)

On April 11, 2016, LRC was seen by Nihit Gupta, M.D. (R. 685-90.) Dr. Gupta

acknowledged that LRC:

> [H]as been noted to be impulsive, aggressive with significant symptoms of
> hyperactivity, irritability as she is fidgety, cannot sit still, has [a] difficult
> time being quiet as she talks excessively, is impulsive, impatient and
> interrupts people as [they are] talking. She's been also found to be
> inappropriate as she makes sexual comments when upset with peers or staff,
> both at school/daycare and home. There is also irritability which is especially
> evident at home as she has been aggressive, breaking things and has required
> constant supervision.

(R. 685.)

In his assessment, Dr. Gupta noted: "Psychologically, she appears to be

appropriate for her age but may have some indication of attachment issues given the

current living situation (mother works and she spends the majority of a day at school and

daycare). This could be contributing to her inappropriate behaviors include some issues

with boundaries." (R. 689.) Dr. Gupta determined that LRC "appears to have fair social

skills but needs social skills training as she may have issues maintaining boundaries." (R.

689.) Dr. Gupta listed ADHD and ODD in the primary diagnoses and Depression, rule

out Anxiety in the secondary diagnoses. (R. 689.) Dr. Gupta recommended starting

guanfacine, a treatment to target hyperactivity and impulsivity. (R. 689.) He prescribed a 0.5 mg dose for LRC to be taken twice a day. (R. 697.)

Dr. Gupta saw LRC again on May 9, 2016 and noted that LRC was "Overall, doing better since being started on Guanfacine but has not been able to get the medication at school." (R. 701.) He also noted that LRC's "behavior has also been good at school, especially in [the] morning." (R. 701.) Dr. Gupta provided a doctor's note to help with access to guanfacine at school. (R. 712.)

On July 18, 2016, Claudia Campo, M.D., M.S. saw LRC and noted that LRC was not experiencing side effects from the medication and that it had continued to help with mood swings and aggression, but that LRC continued to have trouble focusing. (R. 730.) Dr. Campo further noted that LRC's hyperactivity varied by the circumstances, but her history of suspensions for biting other children and aggressive behavior had since reduced. (R. 730.)

Dr. Campo filled out a medical source statement ("MSS") form two days later on July 20, 2016. (R. 584-88.) Dr. Campo noted that she had first seen LRC on July 18, 2016, but LRC had been seen by other providers in her clinic since April 11, 2016. (R. 584.) Dr. Campo noted a principal diagnosis of ADHD, combined type and a secondary diagnosis of rule-out ODD. (R. 584.) On the MSS, Dr. Campo checked "psychomotor agitation" and "difficulty concentrating" as LRC's signs and symptoms. (R. 584.) Dr. Campo also reported other inattentiveness and distractibility as symptoms of her diagnoses. (R. 585-86.) Regarding treatment, Dr. Campo listed guanfacine and noted that LRC's mother reported "decreased agitation and irritability with it" and no side

effects. (R. 585.) Dr. Campo selected marked limitations in "acquiring and using information and/or communicating with others"; "attending and completing tasks/maintaining concentration, persistence, and pace"; and "interacting and relating with others." (R. 587.) Dr. Campo selected "no limitation" for "moving about and manipulating objects"; "caring for yourself"; and "health and physical well-being." (R. 587.)

Dr. Campo saw LRC again on August 15, 2016 for medication management. (R. 740.) At the visit, LRC's mother reported that "Things have been going okay." (R. 741.) LRC's mother reported that LRC has still had trouble receiving medication at school or daycare and that LRC has undergone "mood swings over the course of days, where she appears, down and depressed and then hyperactive. [LRC's] Mother also notes that [LRC] engages in destructive behaviors when upset, such as recently pouring a gallon of water over her clothes in her room, peeling the paint off the walls, and taking the closet doors of their hinges in her room. [LRC's] Mother states that [LRC] will also throw and slam things." (R. 741.) To address the medication disbursement problem, Dr. Campo modified LRC's prescription such that the medication be taken once daily, in the morning at home. (*See* R. 742.)

In first grade, LRC had several disciplinary incidents. On October 26, 2016, she was reported grabbing the bus driver's arm, constantly moving around the bus, and physically assaulting peers on the bus. (R. 598.) On October 31, 2016, LRC was reported after she "[t]ouched another student's bottom after student asked her to stop [and] [l]eft time out area without permission." (R. 597.) On November 22, 2016, LRC

had a violation for "hands on other students." (R. 597.) During the fall of her first-grade year, her teacher assessed her as "rarely" interacting with others, resolving conflict peacefully, and respecting rights and property of others. (R. 599.)

LRC's next primary care appointment was on December 8, 2016 with Mark Lynn, Ph.D., L.P., when she was seen for problematic symptoms of behavioral problems and escalating aggression. (R. 752.) Dr. Lynn developed a plan for follow-ups to track LRC's progress. (R. 753.)

On December 13, 2016, LRC's mother sent a fax to her representative and the Social Security Administration stating that LRC transferred schools on November 28, 2016 "and the school is in the process for a I.E.P. Plan for her." (R. 287.)

On December 14, 2016, LRC underwent a diagnostic assessment from Marcia Jensen, Ph.D., L.P. (R. 763-73.) Dr. Jensen noted that LRC had transitioned custody from her mother to a family friend, Sheree B., who had been assigned temporary custody on November 25, 2016 because LRC's mother felt she could no longer manage LRC's behavior. (R. 763, 767.) Sheree B. "stated that [LRC] has limited social skills due to being an only child and frequently invades [Sheree B.'s] children's personal space. [LRC] acknowledged physical fighting with [Sheree B.'s] older daughter." (R. 764.) Regarding LRC's educational history, Dr. Jensen noted that LRC's kindergarten teacher noted areas of concern in the realm of social functioning and that LRC "engages in inappropriate conversations and behaviors with peers and adults to gain attention" and "observed that [LRC] did not respond appropriately to peers' requests for her to stop and would turn it into a game to follow a peer or get in their space in an effort to play." (R.

768.)  As of this assessment, LRC's progress in first grade was unclear due to recent school transition; LRC did not have an IEP or receive special education class, but LRC was being evaluated for special education eligibility.  (R. 768.)  Sheree B. noted concerns to Dr. Jensen of "trouble paying attention, irritating other children, repeating questions" but noted that LRC was "very loving."  (R. 769.)  Dr. Jensen determined that LRC "meets the DSM-V criteria for Attention-Deficit/Hyperactivity Disorder, Combined Presentation based on parent/caregiver and teacher reports of clinically significant symptoms of inattention and hyperactivity/impulsivity with associated impairment."  (R. 770.)  Dr. Jensen noted that LRC likes her peers and teachers, but she frequently sought attention in inappropriate ways.  (R. 770.)  In the Clinical Summary, Dr. Jenson noted "longstanding concerns" about LRC's "inappropriate attention seeking and failure to observe personal boundaries," but thought "some of her behaviors [we]re likely due to her recent stressors."  (R. 771.)  She also noted that teacher ratings did not include the clinically significant levels of ODD and that Sheree B. said LRC would respect adult authority and was not defiant.  (R. 771.)

Sheree B. took LRC to another checkup on December 21, 2016 with Rhamy Magid, M.D., due to behavior concerns and concerns about LRC's medications.  (R. 806.)  Sheree B. told Dr. Magid that LRC had been fighting a lot with Sheree B.'s two children.  (R. 806.)  Dr. Magid did not make any medication changes.  (R. 809.)

LRC's grandmother took her to a January 30, 2017 visit with Carornyr Figueroa, M. D.  (R. 842.)  LRC's grandmother took over guardianship on December 23, 2016, from Sheree B.  (R. 852.)  Dr. Figueroa noted that LRC said she was "feeling well" at the

appointment.  (R. 843.)  Dr. Figueroa also noted that LRC was attending a new school and "does not have an IEP in school."  (R. 843.)  Dr. Figueroa increased the dosage of LRC's daily medication to address her ADHD and anxiety.  (R. 844.)

On February 16, 2017, LRC's grandmother took LRC to see Dr. Jensen.  (R. 861.)  LRC reported having interpersonal conflicts with her 10-year-old aunt (her grandmother's daughter) who had down syndrome and is nonverbal.  (R. 862.)  Specifically, LRC reported her aunt was scratching, pinching, and hitting her sometimes and once the aunt was "eating her own feces and smearing it in various areas of [the] house."  (R. 862.)  LRC and her grandmother also reported that LRC had suffered some abuse from her mother, which had left pinch marks on LRC's arm from months ago.  (R. 862.)

On February 21, 2017, LRC was seen by Dusty Hackler, Ph.D.  (R. 871.)  Dr. Hackler reported that LRC "was a kind and thoughtful child who tried her hardest across tasks, smiled frequently, and engaged easily with examiner."  (R. 872.)  Dr. Hackler also reported much inattentive, hyperactive, and impulsive behavior during the visit.  (R. 872.)

LRC saw Dr. Figueroa on February 27, 2017 accompanied by her grandmother.  (R. 879.)  LRC's grandmother described LRC as "overly friendly" to Dr. Figueroa.  (R. 880.)  Dr. Figueroa reported that LRC does not have an IEP in school.  (R. 880.)

On March 8, 2017, LRC saw Dr. Jensen with her grandmother.  (R. 915.)  LRC "reported having a positive visit at her grandmother's home with her father and half siblings last week and stated that she was looking forward to a visit with her mother at her mother's house this weekend.  She indicated feeling happy to see her mother and

stated that her mother appears happy to see her when she arrives and through the visit. She endorsed some anxiety around her [ten-year-old aunt], and she described strategies she could use to help herself feel more calm and safe." (R. 915.)  LRC saw Dr. Jensen again on March 16, 2017, and reported some issues at school, including that "some kids in her class think she is annoying and a girl on her bus calls her stupid and ugly." (R. 923.)  LRC's grandmother expressed concern about how LRC's school handles her tendency to be in other people's personal space. (R. 923.)  LRC's grandmother stated that LRC had been a big help with her ten-year-old aunt with disabilities. (R. 923.)

Dr. Jensen referred LRC to Dr. Heckler for a comprehensive psychological evaluation for diagnostic clarification over concerns of possible posttraumatic stress disorder ("PTSD"), ADHD, ODD, language disorder, and specific learning disorder. (R. 930.)  Dr. Heckler based his evaluation on visits with LRC on February 21 and March 3, 2017 and on earlier medical and school records. (R. 930.)  Dr. Heckler concluded that LRC did not have sufficient symptoms for PTSD but qualifies for Other Specified Trauma- and Stressor-Related Disorder with insufficient symptoms, but clinically significant distress and impairment. (R. 943.)  Dr. Heckler also concluded that LRC did not have ADHD at the time because "her symptom presentation is also consistent with that of a child who has been exposed to trauma(s)." (R. 943-44.)  Dr. Heckler did not diagnose LRC with ODD because "[g]iven mixed endorsements of oppositionality and conduct issues across respondents, it is likely that [LRC] struggles to self-regulate in unstructured (i.e., home) settings versus in more structured (e.g., school, testing office) settings," which "can also be related having a trauma history." (R. 944.)

Dr. Heckler determined that LRC has a language disorder, which is "likely affecting her ability to build age-appropriate peer relationships and communicate effectively with adults." (R. 943.) LRC was further diagnosed with specific learning disorders in reading, written expression, and mathematics based on borderline to low performance in standardized testing for these subjects. (R. 942.) Dr. Heckler noted that LRC "has shown great resilience insofar as she is friendly towards adults and attempts to make new peer relationships even with limited social skills (e.g., projective measures suggest that [LRC] is aware that she may struggle to understand how to interact with others). She has shown at least some ability to adapt to new situations, which was seen during the current assessment, has a sunny disposition and is engaging. She also showed the ability to reframe challenging situations into success stories even when she was not actually successful, and showed self-confidence." (R. 944.) Dr. Heckler stated that LRC "should be provided with in-school supports to address her dysregulation in the classroom, to support her ability to perform academically, and to support her ability to form close peer relationships in a school setting." (R. 945.)

In his evaluation, Dr. Heckler noted that LRC's grandmother overheard LRC telling her three-year-old half sister "to close her eyes and open her mouth, at which time [grandmother] stated that [LRC] picked up a handful of tacks and said she was going to put them into her sister's mouth." (R. 933.) Dr. Heckler also noted that LRC's mother reported that LRC had "engaged in destructive behaviors when upset, including pouring a gallon of water over her clothes in her room, peeling the paint off of the walls, and taking the closet doors of their hinges in her room, throwing things, and slamming things." (R.

944.)  But LRC's teacher "endorsed conduct, aggressive, and rule-breaking behaviors all within normal limits."  (R. 944.)  Dr. Heckler noted that LRC does not have an IEP and although her former school was evaluating her for special education eligibility, she has not received special education.  (R. 932.)

At the hearing before the ALJ on March 29, 2017, Dr. Karen Butler, Ph.D. testified as an impartial medical expert ("ME") with respect to the mental health aspects of the case.  (R. 50-51.)  Plaintiff did not object to her testimony.  (R. 51.)  Dr. Butler testified that she reviewed the relevant portions of the medical record, including LRC's function and disability reports, reports from Hennepin County Medical Center ("HCMC") between 2014 and 2017, medical education records, and a psychological evaluation report with testing from early 2017.  (R. 51; *see* Dkt. No. 16-1 at 2-3.)  Dr. Butler testified that based on the record, she assessed LRC's condition as severe but it did not meet or equal the listings.  (R. 54.)  Dr. Butler testified that LRC's limitations in "using and acquiring behavior," "attending and completing tasks," "interact with others," and "ability to move and manipulate objects" were "less than marked or moderately impaired."  (R. 54, 55.)  Dr. Butler testified that LRC's "ability to care for herself" was "marked."  (R. 56.)  Dr. Butler testified that LRC had no limitation in "physical health and wellbeing."  (R. 56.)

## III.   LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r, Soc. Sec.*

*Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g);

*Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "'Substantial evidence is

less than a preponderance, but enough that a reasonable mind would find it adequate to

support the Commissioner's conclusions.'" *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037,

1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the

Commissioner's decision as well as evidence that supports it." *Id.* "If substantial

evidence supports the Commissioner's conclusions, this court does not reverse even if it

would reach a different conclusion, or merely because substantial evidence also supports

the contrary outcome." *Id.* (citation omitted). In reviewing the record for substantial

evidence, the Court may not substitute its own judgment or findings of fact for that of the

ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

## IV.   DISCUSSION

Plaintiff makes three principal arguments for reversal or remand: (1) the ALJ erred

in not finding that LRC had a marked limitation in "interacting and relating to others"

(Dkt. No. 18 at 13-24; Dkt. No. 23 at 5-10); (2) the ALJ failed to fully develop the record

by not getting the IEP and other records from LRC's former school (Dkt. No. 18 at 24-

27; Dkt. No. 23 at 8-10); and (3) the ALJ erred in not finding LRC had an extreme

limitation in "caring for yourself" (Dkt. No. 18 at 30 n.19; Dkt. No. 23 at 2-3). The Court

addresses each in turn.

**A.**     **Substantial Evidence Supports the ALJ's Finding For "Interacting and Relating to Others."**

The social security regulations describe the domain of "interacting and relating with others" as "how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). Examples of limitations in the domain of "interacting and relating with other" (not necessarily "marked" or "extreme") include:

> (i) You do not reach out to be picked up and held by your caregiver.
> (ii) You have no close friends, or your friends are all older or younger than you.
> (iii) You avoid or withdraw from people you know, or you are overly anxious or fearful of meeting new people or trying new experiences.
> (iv) You have difficulty playing games or sports with rules.
> (v) You have difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.
> (vi) You have difficulty speaking intelligibly or with adequate fluency.

20 C.F.R. § 416.926a(i)(3).

The crux of Plaintiff's argument is that the ALJ should have found that LRC had either a "marked" or "extreme" limitation in the domain of "interacting and relating to others" based on (1) medical and school records (Dkt. No. 18 at 13-21), and (2) the opinion evidence from Dr. Campo and NP Johnston (*id.* at 21-24). For the reasons stated below, the Court finds that the ALJ did not err.

1. **The ALJ Properly Weighed the Evidence in the Record Regarding "Interacting and Relating with Others."**

The full reasoning the ALJ gave for finding that LRC has a "less than marked limitation in interacting and relating with others" is as follows:

> During an early assessment when she [w]as 4-years old, the assessor concluded she did not respond to social cues that most 4-years olds would recognize and that was negatively impacting her social relationships. Medical providers further concluded she needed social skills training because she was a very friendly child but had poor boundaries. Indeed, she often lost her temper and blamed others for her mistakes. Additionally, she hit, kicked, spit at, inappropriately touched, and was aggressive towards other children. Her teachers stated she needed many reminders and guidance about being aware of her personal space and accepting reasonability for her actions in the classroom. However, she did enjoy being with peers and greeted each of them with a big smile. She also tried to interact appropriately with peers and adults, but struggled to make friends because she sometimes did not keep her hands to herself and needed to be a better listener/direction-follower. (Exhibits 6F2, 15F4, 17F74, 88, 51, 18F20, 47, and 23F3)
>
> Although the record reflects behavioral issues at school or on the bus, the child was not on medications or in counseling as had been recommended. (Exhibit 15F) However, in September 2015, the mother reported to the provider that the child had behavioral problems in the past and that was not a concern. (Exhibits l 7F, p. 15)
>
> The evaluator who examined the claimant in March 2017 concluded she "has shown great resilience insofar as she is friendly towards adults and attempts to make new peer relationships even with limited skills (e.g., projective measures suggests that [LRC] is aware that she may struggle to understand how to interact with others). She has shown at least some ability to adapt to new situations, which was seen during the current assessment, has a sunny disposition and is engaging. Another more recent assessor also noted the claimant was cooperative, engaged, and pleasant with only mild intrusiveness when the assessor was talking to the mother during the claimant's assessment. (Exhibits 18F20, 23Fl2, and 15)

(R. 22.)

Plaintiff argues that the ALJ addressed the evidence too generally and ignored evidence relevant to this domain. In support of this, Plaintiff provided a list of fifty incidents in her opening brief which she contends the ALJ ignored. (Dkt. No. 18 at 16-18.) First, many of the incidents do not fit best within the domain of "interacting and relating with others" such as: (1) excessive masturbation; (2) bed wetting; (20) nightmares/sobbing in bed; (25) feelings of worthlessness/guilt/hopelessness/statements like "I wish I wasn't here"; (31) witness to domestic violence; (32) experienced emotional abuse; (33) experienced some sort of "hurt" from several people; (48) breaking things to the point where she needs constant supervision; (49) bi[t]ing herself/very negative about herself; and (50) snapping photos of her private parts. (*Id.*) Second, the bulk of the other incidents in Plaintiff's list were addressed by the ALJ, including that LRC "hit, kicked, spit at, inappropriately touched, and was aggressive towards other children," "she needed many reminders and guidance about being aware of her personal space and accepting reasonability for her actions in the classroom," "the record reflects behavioral issues at school and on the bus," and "[s]he also tried to interact appropriately with peers and adults, but struggled to make friends because she sometimes did not keep her hands to herself and needed to be a better listener/direction-follower." (R. 22.) Plaintiff argues that had the ALJ addressed this evidence as specifically in the context of "interacting and relating to others" as she had in the context of "caring for yourself," the ALJ would have found a marked impairment in "interacting and relating to others." (Dkt. No. 18 at 12-14.) Although the ALJ's references to these incidents may have been more general in the context of "interacting and relating with others," her familiarity with the

underlying facts was demonstrated elsewhere in her decision, and the decision reflected her consideration of those underlying facts in that context.[5] Third, several incidents, including Plaintiff's allegation that LRC had an IEP were found inconsistent with the evidence by the ALJ, as discussed further in Part IV.B, *infra*. "This court will not substitute its opinion for the ALJ's, who is in a better position to gauge credibility and resolve conflicts in evidence." *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007). Thus, the Court concludes that the ALJ did not err in addressing the relevant evidence in the "interacting and relating with others" domain.

### 2. The ALJ Properly Weighed the Opinion Evidence.

Plaintiff contends that the ALJ did not give sufficient reasons for discounting the opinions of Dr. Campo and NP Johnston and excessively relied on the ME, Dr. Butler's opinion. The ALJ addressed Dr. Campo's MSS as follows:

> Claudia Campo-Soria, M.D., the claimant's treating psychiatrist, opined, on July 20, 2016 that neither the claimant's impairments nor treatment will cause her to miss school; however, she has marked limitation in acquiring and using information, attending and completing tasks, and interacting and relating with others but no limitations in moving about and manipulating objects, caring for self, or health and physical well-being. According to Dr. Campo, the claimant often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort, is often distracted by extraneous stimuli, often leaves her seat in situations when remaining seated is expected, is often "on the go" acting as if "driven by a motor", and is intrusive in other people's space. Dr. Campo states these symptoms are present in school and at daycare. (Exhibits 12Fl-5) The undersigned places little weight on Dr.

---

[5] Similarly, the behaviors Plaintiff relies on in her reply brief (e.g., suspensions, hitting, striking, licking, spitting, touching, yelling, biting, threatening, aggressiveness) (Dkt. No. 23 at 5) were all referenced in the ALJ's discussion of the "interacting and relating with others" section. (R. 22 (e.g., "she often lost her temper . . . Additionally, she hit, kicked, spit at, inappropriately touched, and was aggressive to other children", "the record reflects behavioral issues at school or on the bus").)

Campo-Soria's opinion because she made the opinion after one visit with the child and it is inconsistent with the Hennepin County Medical Center records and the other records across all settings that Dr. Butler reviewed.

(R. 26.) Plaintiff argues that the ALJ's reasons for discounting Dr. Campo's opinion fail because (1) Dr. Campo's opinion cannot be inconsistent with Hennepin County Medical Center ("HCMC") records because she is an HCMC provider, and (2) because Dr. Campo's colleagues at HCMC had seen LRC for several months, the one visit with Dr. Campo is "not accurate." (Dkt. No. 18 at 22.)

"A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. An ALJ may elect under certain circumstances not to give a treating physician's opinion controlling weight. For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence in [the] case record.'" *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)) (citing *Goff*, 421 F.3d at 790; *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)). "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) (alteration in original) (internal quotation omitted). Moreover,

"a treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability."  *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (quoting 20 C.F.R. §§ 416.927(e)(1), (3)) (citation omitted).

First, there is substantial evidence supporting the ALJ's finding that Dr. Campo's opinion is inconsistent with HCMC records.  Even if the HCMC records were to be considered those of Dr. Campo (even though LRC was treated by other providers), a treating physician can render an opinion that is inconsistent with her own records, thereby diminishing the opinion's weight.  *Hacker*, 459 F.3d at 937 (citation omitted).  Here, there are numerous records inconsistent with Dr. Campo's finding regarding "interacting and relating with others."  For example, in his assessment, Dr. Heckler stated that LRC "has shown great resilience insofar as she is friendly towards adults and attempts to make new peer relationships even with limited social skills" and "has a sunny disposition and is engaging."  (R. 944.)  Dr. Gupta assessed LRC as "pleasant and cooperative" with speech "articulate appropriate" with "spontaneous elaborations."  (R. 702.)  At another visit, Dr. Gupta stated that LRC "appears to have fair social skills but needs social skills training as she may have issues maintaining boundaries."  (R. 689.)  At her one visit with Dr. Campo, Dr. Campo assessed LRC as "Cooperative, Engaged and Pleasant" with "Mild intrusiveness during conversation with mother."[6]  (R. 730.)  Additionally, Dr. Campo's

---

[6]    Numerous medical records between 2014 and 2017 indicated that LRC's behavior and demeanor was cooperative and pleasant.  (*E.g.*, R. 443-44, 467, 520, 617, 619, 663, 671, 730, 741, 752, 769, 780, 809, 853, 863, 872, 880, 890, 916, 924, 934-35.)

opinion is inconsistent with Dr. Butler's opinion, which was a "less than marked or moderately impaired" limitation. (R. 55 (noting that records said LRC "was very friendly but had poor boundaries" and "enjoyed being with peers").) These records are not consistent with a marked impairment in "interacting and relating with others."

Second, LRC was in fact only seen by Dr. Campo once before Dr. Campo formed her opinion on July 20, 2016. (R. 584.) The only prior visit was on July 18, 2016. (R. 732.) Although Dr. Campo noted that LRC had been seen by other providers in her clinic since April 11, 2016 (R. 584), there is no indication Dr. Campo had worked directly with the other providers in the treatment of LRC or considered their opinions when filling out the MSS. Indeed, the MSS does not otherwise reference any notes from the other providers at HCMC (*see generally* R. 584-88), so there is little reason to attribute the care from other providers to Dr. Campo's opinion. For these reasons, the Court finds no error in the ALJ's decision to give little weight to Dr. Campo's opinion.

The ALJ addressed NP Johnston's opinion as follows:

> Mary Johnston, RN, CNP, the claimant's treating nurse practitioner, opined in a letter dated September 8, 2014 that the claimant's auditory comprehension is weak and her expressive communication is scored below average per evaluations done in March and July of 2014 by the Health Dimensions. Ms. Johnston also opined the claimant has ongoing moderate persistent asthma, which is not always well controlled and a history of chronic ear infections. Nurse Johnston remarked the claimant does not appear to have good personal boundaries and does not respond to the social cures that most 4-years old recognize like disapproval or personal space issues. Because of her lack of ability to comprehend what others want and to express fully what she wants, she is frustrated, per Nurse Johnson, and this frustration is very likely a large part of her noted aggressive behavior at home and at school. In my opinion, Nurse Johnston stated the claimant qualifies for Social Security Disability as she has significant difficulties in school and in peer relationships. (Exhibits 6F2-3) The undersigned places little weight

on these generic conclusions as Nurse Johnston does not cite specific objective evidence or tests to support her conclusions and her conclusory statements are not supported when resolving the conflicting evidence in the file[] as testified by Dr. Butler at the hearing.

(R. 27.) Plaintiff disagrees with the ALJ that NP Johnston's opinion is generic and not supported by specific objective evidence. (Dkt. No. 18 at 23 ("The above report speaks for itself as Nurse Johnston provided a plethora of data to support her statements.").)

The Court finds that the ALJ's decision to discount NP Johnston's opinion is supported by substantial evidence. "A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007). Here, NP Johnston's opinion does not cite specific objective evidence, but rather speaks generally. NP Johnston, in a September 8, 2014 letter to the Social Security Administration, stated:

> Mom is tries [sic] hard to help her with all her needs but [LRC] requires constant attention. Even in clinic, [LRC] continually attempts to draw attention to herself and is unable to sit still or focus for long on an activity. She pushes people to be hugged constantly, pulls on any tool the provider is using and does not respond to direct requests to stop. She does not appear to have good personal boundaries and does not respond to the social cues that most 4 year olds recognize like disapproval or personal space issues. Because of her lack of ability to comprehend what others want and to express fully what she wants, she is frustrated. This frustration is very likely a large part of her noted aggressive behavior at home and at school; her social interactions are therefore not positive which reinforces her negative behavior.

(R. 474.) NP Johnston's opinion appears to be based on her observations of LRC in clinic, rather than on the many other observations in the record. It is also inconsistent with the record for the same reasons stated above that Dr. Campo's

opinion is inconsistent with records, including Dr. Butler's opinion. "This court will not reverse merely because evidence also points to an alternate outcome." *Travis*, 477 F.3d at 1042. Moreover, NP Johnston's opinion that LRC qualifies for disability "does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability." *Davidson*, 578 F.3d at 842 (citation omitted).

The Court also finds that the ALJ did not improperly weigh the opinion of Dr. Butler, which the ALJ gave "great weight" because Dr. Butler "reviewed the longitudinal evidence using her expertise and specialized knowledge in assessing mental impairments and the listings within the SSA disability analysis and cited extensively to the record in support of her testimony." (R. 16.) Plaintiff argues this was in error because Dr. Butler "does not specialize in the treatment of children." (Dkt. No. 18 at 24 (citing R. 15).) Plaintiff did not object to Dr. Butler's testimony on these grounds (or any other grounds) at the hearing. (R. 51.) Plaintiff's support for this in the record merely states that Dr. Butler specializes in "Clinical Psychology," (R. 15), but even assuming Dr. Butler does not specialize in the treatment of children, the ALJ's reasons are supported. "It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004) (citing *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000); 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)). The Court finds that the ALJ properly explained the reasons for the weight assigned to the opinion of Dr. Butler.

**B.     The ALJ Fully Developed the Record.**

Plaintiff argues that the ALJ failed to fully develop the record by not obtaining records from one of LRC's schools, which Plaintiff contends includes an IEP.  (Dkt. No. 18 at 24.)  Defendant counters that LRC was only at that particular school for a brief period of time, and she did not have an IEP, and thus the ALJ fully developed the record. (Dkt. No. 21 at 19-21.)

"[T]he ALJ has a duty to develop the record fully, fairly, and particularly when the claimant is not represented by counsel." *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988) (citing *Driggins v. Harris*, 657 F.2d 187, 188 (8th Cir. 1981) (per curiam)).  Where the claimant is represented by a lawyer, "it is of some relevance to [the court] that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).  In any case, "[a]bsent unfairness or prejudice this court will not remand for further proceedings." *Phelan*, 846 F.2d at 481.

The ALJ made an express finding that LRC does not have an IEP.  (R. 17 ("School records reveal she receives all her coursework in the mainstream classroom as she does not receive any special education classes and she does not have an Individual Education Plan (IEP).).)  The ALJ's finding is supported by substantial evidence.  The only evidence suggesting LRC had an IEP is her caretaker Sheree B.'s assertions that one of her schools in December 2016 (Sheridan Elementary) was "evaluating her for special education eligibility"  (R. 768) and LRC's mother's testimony at the March 29, 2017 hearing that LRC's current school was "processing [an IEP] now" and the therapist on the

assessment recommended that LRC have an IEP.  (R. 44.)  However, at the same time, Sheree B. said that LRC "does not have an [IEP] or receive special education classes." (R. 768.)  This latter statement—that LRC does not have an IEP or receive special education class—is consistent with all of LRC's records.  (R. 671, 843, 880, 932.)  In particular, in Dr. Heckler's March 2017 comprehensive evaluation, he noted that the special education providers at LRC's school that was evaluating her for special education classes stated that LRC "does not have an IEP and has not received a prior psychoeducational evaluation that she is aware of."  (R. 932.)  It is clear that LRC did not have an IEP, and to the extent the evidence could be considered conflicting, "[i]t is the ALJ's duty to resolve conflicts in the evidence."  *Travis*, 477 F.3d at 1041.  Thus, substantial evidence supports the ALJ's finding that LRC did not have an IEP or receive special education classes between March 20, 2014 and the March 29, 2017 hearing.

Moreover, to the extent LRC's mother's testimony at the March 2017 hearing suggests the school was developing an IEP for LRC at the time of the hearing, remand still would not be warranted because Plaintiff has failed to establish unfairness or prejudice resulting in the ALJ's alleged failure to develop the record to include that IEP. *See Onstad*, 999 F.2d at 1234 ("In considering [the argument that the ALJ did not fully develop the record], our inquiry is whether [the plaintiff] was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, we will not remand.").  While Plaintiff has criticized the ALJ for not affirmatively seeking out that IEP, Plaintiff has not identified what it is in the alleged IEP that Plaintiff

28

believes renders the ALJ's decision unfair or how its absence prejudiced LRC.[7]  In the absence of any such showing, reversal and remand for failure to develop the record is inappropriate.

## C.  Substantial Evidence Supports the ALJ's Finding for "Caring for Yourself."

In her opening brief, Plaintiff makes a passing argument that "the ALJ's own findings established . . . an extreme limitation in one domain – 'caring for yourself.'" (Dkt. No. 18 at 30.)  Plaintiff stated this was the case because the ALJ's two reasons why an extreme limitation was not warranted were false: (1) LRC does not have an IEP and (2) LRC never required special education services.  (*Id.* at 30 n.19.)  Defendant argued that Plaintiff failed to develop this argument beyond a bare assertion and therefore waived it.  (Dkt. No. 21 at 6 n.1.)  Plaintiff may have indeed waived this argument.  *See Craig v. Apfel*, 212 F.3d 433, 437 (8th Cir. 2000) (Plaintiff "did not articulate this argument before the district court.  The claim has thus been forfeited; accordingly, we decline to address it."); *see also Melder v. Colvin*, 546 F. App'x 605, 606 (8th Cir. 2013) (unpublished) (undeveloped argument is deemed waived).  But even if not waived, the Court concludes that the ALJ's finding of a "marked limitation" (rather than an "extreme limitation") for "caring for yourself" is supported by substantial evidence.

---

[7]     The Court notes that neither Plaintiff's mother nor Plaintiff's non-attorney representative at the hearing before the ALJ (who was involved as of December 2016, several months before the March 2017 hearing) sought permission to supplement the record to include an IEP, even after LRC's mother's testimony.  Further, the non-attorney representative did not seek to supplement the record when seeking review before the Appeals Council in June 2017 (R. 287, 311), and LRC's counsel in this proceeding has not sought to supplement the record with the allegedly missing IEP.

The domain of "caring for yourself" includes an evaluation of "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area." 20 C.F.R. § 416.926a(k). Examples (not necessarily marked or extreme) of limitations in "caring for yourself" include:

> (i) You continue to place non-nutritive or inedible objects in your mouth.
> (ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).
> (iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.
> (iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.
> (v) You do not spontaneously pursue enjoyable activities or interests.
> (vi) You have disturbance in eating or sleeping patterns.

20 C.F.R. § 416.926a(k)(3).

The social security regulations define an extreme limitation as:

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3).

The ALJ noted various behavioral incidents including kindergarten and first grade suspensions for inappropriate behavior, biting and hitting other children, engaging in destructive behaviors when upset such as pouring water over clothing and peeling paint off walls, but the ALJ also noted that LRC's medication helped with aggression and compulsion without side effects, and that her most recent assessment had ruled out ADHD. (R. 24-25.) Moreover, as noted above, the ALJ cited the lack of an IEP or special education services as supporting a less than extreme limitation. (R. 25.)

The ALJ properly found that LRC's aggression and compulsion were moderated by the prescribed medication. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Hensley v. Colvin*, 829 F.3d 926, 933-34 (8th Cir. 2016) (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)). Both Dr. Gupta and Dr. Campo[8] noted that after starting guanfacine, LRC was calmer and had decreased agitation and irritability with it. (R. 585, 701.) It was also noted that LRC did not have side effects from the treatment. (R. 585.) The ALJ also noted that LRC's most recent assessment did not diagnose her with ADHD because her symptom presentation was consistent with exposure to trauma. (R. 943-44.) Lastly, as noted in Section IV.B *supra*, the evidence supports the ALJ's finding that LRC did not have an IEP or take special education classes, which further supports a finding that her "caring for yourself" domain was marked rather than extreme.

---

[8] In her MSS, Dr. Campo listed "no limitation" for the "caring for yourself" domain. (R. 587.)

## V.   ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.     Plaintiff's Motion for Summary Judgment (Dkt. No. 17) is **DENIED**;

2.     Defendant Acting Commissioner of Social Security Andrew Saul's Motion for Summary Judgment (Dkt. No. 20) is **GRANTED**; and

3.     This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: July 17, 2019                    *s/Elizabeth Cowan Wright*
                                        ELIZABETH COWAN WRIGHT
                                        United States Magistrate Judge